

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID ROTH, On Behalf of Himself and All Others Similarly Situated, | )<br>)<br>) |
| Plaintiff, | ) Lead Case No. 04-C-6835<br>) |
| v. | ) <u>CLASS ACTION</u><br>) |
| AON CORPORATION, PATRICK G. RYAN, MICHAEL D. O'HALLERAN and DAVID P. BOLGER, | ) Honorable Charles R. Norgle<br>)<br>)<br>) |
| Defendants. | ) |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is Defendants' Motion to Reconsider Denial of Their Motion to Dismiss the Consolidated Amended Complaint in Light of New Controlling Authority ("Motion to Reconsider"). Defendants are asking this Court to reconsider its Memorandum Opinion and Order filed March 2, 2006, which denied Defendants' previously filed Motion to Dismiss ("Motion") the Plaintiffs' Consolidated Amended Complaint ("Complaint"). For the following reasons, upon reexamination of the Complaint and in light of the United States Supreme Court's decision in <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S.Ct. 2499 (2007), Defendants' Motion for Reconsideration is denied.

## I. BACKGROUND

### A. FACTS

This case arises out of the New York State Attorney General's ("NYAG") investigation of the insurance brokerage industry. In early 2004 the NYAG subpoenaed a number of industry participants, including Aon, with respect to their contingent commission practices. As the term

is used in the Complaint, "contingent commissions" refers to a practice in which brokers such as Aon received payments from insurers based on the overall volume or profitability of business that brokers placed with those insurers. Defs. Memo at 4. Through these arrangements insurance brokers would allegedly direct or steer business to insurers willing to use their services when buying reinsurance in order to generate a large influx of margin revenues that came in the form of commission payments. Compl. at ¶¶ 60, 159-60. Such arrangements, allegedly, were rather lucrative for the broker. See id. at ¶¶ 60, 62, 160. However, the contingent arrangements also resulted in significant costs to clients and customers. When this realization surfaced, the NYAG initiated its investigation.

In October 2004, the NYAG filed a lawsuit against insurance brokers Marsh & McLennan Companies, Inc. and Marsh, Inc. ("Marsh"), detailing the contingent commission arrangements that a number of large insurance brokers used to allegedly inflate "their business and cause customers to purchase insurance at higher prices and less favorable terms than the market otherwise would have [called for]." Id. at ¶¶ 25, 156. Shortly after the NYAG filed the complaint against Marsh & McLennan, the Defendants admitted that Aon participated in similar contingent commission agreements. Id. at ¶¶ 26, 157. The Defendants, however, explained that the commissions were earned for "services provided to insurers," which were well-known in the insurance industry. Id. Despite this explanation, Aon's stock price fell sharply in light of the press coverage that followed the Defendants' admission. Id. at ¶¶ 27, 158, 161.

Before long, the NYAG began a focused investigation of Aon's contingent commission practices. Id. at ¶¶ 28-30. On October 22, 2004, in view of the focused investigation, the Defendants had a change in tune. They now explained that the contingent commission arrangements were "non-service-specific, volume-or profit-based compensation arrangements."

2

Id. at ¶¶ 31, 162. Aon then cancelled all of its outstanding contingent commission agreements and promised to "establish a new business model that ensure[d] appropriate linkage of compensation to specific measurable services in a way that is transparent, accepted and understood by clients." Id.

On March 3, 2005 the NYAG and regulatory authorities in New York, Connecticut and Illinois filed a detailed complaint against Aon stemming from its contingent commission practices. Id. at ¶ 33; Compl. Ex. 1. The next day the Defendants announced that they had settled the action and agreed to pay $190 million to regulators and to prohibit any future contingent commission, steering or clawback practices. Compl. at ¶ 188. In conjunction with the settlement, Defendant Ryan, the CEO and Chairman of the Board of Aon at all relevant times, issued the following statement:

> Aon and other insurance brokers and consultants entered into contingent commission agreements and other arrangements that created conflicts of interest. I deeply regret that we took advantage of those conflicts. This conduct violated the longstanding principle embodied in our Code of Conduct and Aon's Values Statement that our clients must always come first. Such conduct was improper and I apologize for it.

"Statement of Patrick G. Ryan," Compl. at Ex. 1.

The time period at issue is between May 3, 2003 and October 13, 2004 (the "Class Period"). In the months leading up to the Class Period, Aon's financial performance began to waver. Compl. at ¶¶ 6-9. With this in mind, Plaintiffs allege, the Defendants sought to change the market's perception of Aon's disappointing financial performance. Id. at ¶ 10. As it turned out, contingent commission arrangements, as an expense-free source of revenue, provided a reasonable solution. Id. These arrangements allowed Aon to allegedly report higher earnings because the revenue generated from contingent commissions was pure profit. Id. For the

3

Defendants, this was quite an incentive, and contingent commission arrangements soon became the core of Aon's business model. Id. at ¶¶ 10, 12, 57.

As part of the alleged scheme, Aon steered its clients to those insurance companies with whom Aon had contingent commission arrangements. Id. at ¶ 62. In doing so, regardless of the costs to the client, Aon could allegedly pressure insurance companies into signing contingent commission agreements and determine which of those insurance companies received business in return. Id. at ¶¶ 64-68. Internal Aon e-mails support the existence of this practice. Id.; Compl. Ex. 5, 8-10, 12-14. The steering scheme, as alleged, was so pervasive that Aon began to manipulate its bidding practices to ensure that its "preferred" insurance underwriters would receive the potential business. Id. at ¶ 69. All of this was done with the knowledge and direct participation of the individual Defendants, who "relied on revenue generated by the undisclosed commission agreements and steering schemes to report quarterly income growth." Id. at ¶ 80.

According to Plaintiffs, other Aon departments, such as Aon's reinsurance business ("Aon Re"), also participated in the alleged arrangements. Id. at ¶ 81. Using its alleged ability to determine which insurance companies received underwriting contracts, Aon negotiated agreements with insurance companies to purchase reinsurance from its affiliate, Aon Re, who would then reduce or eliminate its reinsurance brokerage fees by steering retail business back to the insurance company that entered into the deal. Id. at ¶¶ 82-83. Aon referred to these agreements informally as "clawbacks." Id. at ¶ 82. Through this practice, Aon opened the possibility to receive an additional reinsurance contingent commission, leveraged its retail brokerage arrangements and gained a competitive advantage over competing reinsurance brokers. Id. at ¶¶ 81-82, 84.

Throughout the Class Period the Defendants issued a number of press releases, held conference calls with analysts and filed quarterly reports with the SEC regarding Aon's revenues and income, all of which had a direct effect on the company's stock price. Id. at ¶¶ 105-109, 112-117, 120-124, 127-133, 136-145, 148-153. During the Class Period the Defendants' reports routinely exceeded analysts' expectations. For each reporting period, the Defendants stated that Aon's financial performance was a result of continued client demand for products and services, new business development and better retention rates. Defendants allegedly failed to disclose the magnitude of and the amount of income generated by the company's contingent commission, steering and clawback arrangements, which resulted in millions of dollars of 100% margin commission revenues for the company. Id. at ¶¶ 110(a), 118(a), 125(a), 134(a), 146(a) and 154(a). In this way, the Defendants allegedly inflated the company's expected income and revenue growth, and misled analysts and investors. Thus, as alleged, when the NYAG initiated its investigation and the Defendants finally revealed the company's practices, there was no other direction for the company's stock price to turn but south.

## B. Procedural History

Plaintiffs brought this action on their own behalf and on behalf of all persons who purchased the publicly traded securities of Aon Corporation ("Aon") during the Class Period. Plaintiffs allege that Aon and its senior officers and directors Patrick G. Ryan, Michael D. O'Halleran and David P. Bolger violated Sections 10(b) and 20(a) of the 1934 Securities Exchange Act. Specifically, Plaintiffs assert that throughout the Class Period the Defendants "mislead investors and the market about the improper and illegal basis of Aon's financial results and business performance and failed to disclose [Aon's] direct participation in" its many contingent commission arrangements. Id. at ¶ 2.

On March 24, 2005 the Court named the Monroe County Employees Retirement System, Teamsters Local 408 Pension Fund, Western Pennsylvania Electrical Employees Pension Fund and Hawaii Reinforcing Iron Workers Pension Trust Fund (the "Funds") as the lead Plaintiffs in this action. On May 26, 2005 Plaintiffs filed their Complaint in the lead case. In turn, on August 1, 2005 Defendants filed their Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). On March 2, 2006 this Court entered its Memorandum Opinion and Order denying Defendants' Motion. Thereafter, on June 21, 2007 the United States Supreme Court issued an opinion in Tellabs, Inc. v. Makor Issues ("Tellabs") articulating the standard courts must apply in determining whether a plaintiff has pled a "strong inference of scienter" as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and remanding the case to the Seventh Circuit for consideration under the new standard.

In denying Defendants' previous motion this Court relied on the Seventh Circuit's earlier ruling in Makor Issues & Rights, Ltd. v. Tellabs Inc., 437 F.3d 588 (7th Cir. 2006), which the United States Supreme Court vacated. As such, Defendants are now asking this Court to reconsider its determination and to grant the Motion to Dismiss. The Motion to Reconsider is fully briefed and before the Court. The Court now finds it appropriate to reexamine Plaintiffs' Complaint and to apply the new standard set forth in Tellabs regarding the scienter requirement for securities fraud claims.

## II. DISCUSSION

### A. STANDARD OF REVIEW

#### 1. Rule 12(b)(6)

As always, we take the allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff for purposes of determining whether they state a claim for

relief under Rule 12(b)(6). See, e.g., Sprint Spectrum L.P. v. City of Carmel, Ind., 361 F.3d 998, 1001 (7th Cir. 2004). When reviewing a motion to dismiss under Rule 12(b)(6), the court merely looks at the sufficiency of the complaint, Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 508 (2002); Johnson v. Rivera, 272 F.3d 519, 520-21 (7th Cir. 2001); it does not decide whether the plaintiff has a winning claim. See McCormick v. City of Chi., 230 F.3d 319, 323-26 (7th Cir. 2000) (citing Leatherman v. Tarrant County, 507 U.S. 163 (1993)). Yet, we recognize that a complaint may no longer survive dismissal by simply satisfying the notice function of FED. R. CIV. P. 8(a). See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007).

The Seventh Circuit has recently characterized two "easy-to-clear hurdles" that must be overcome for a complaint to survive a 12(b)(6) motion to dismiss. E.E.O.C. v. Concentra Health Serv., Inc., 496 F.3d 773, 776 (7th Cir. 2007) (interpreting Bell Atlantic v. Twombly). First, the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which the claim rests. Id. Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above a "speculative level;" if they do not, the plaintiff pleads itself out of court. Id. In essence, to clear the second hurdle the complaint must actually suggest that the plaintiff has a right to relief, for it is not enough for a complaint to avoid foreclosing possible bases for relief. Concentra, 496 F.3d at 777.

### 2. *Rule 9(b)*

Rule 9(b) provides that, "the circumstances constituting fraud or mistake shall be pled with particularity." FED. R. CIV. P. 9(b); see Welborn Clinic v. MedQuist, Inc., 301 F.3d 634, 641 (7th Cir. 2002). "The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless." Fidelity Nat'l Title Ins. Co. of New York v. Intercountry Nat'l Title Ins.

7

Co., 412 F.3d 745, 749 (7th Cir. 2005) (internal citations omitted). In securities fraud cases, Rule 9(b) "requires that the essential element of scienter be pled with a sufficient level of factual support: 'the complaint... must afford a basis for believing that plaintiffs could prove scienter.'" In re HealthCare Compare Corp., 75 F.3d 276, 281 (7th Cir. 1996).

### 3. The Scienter Requirement in Securities Fraud Cases

Rule 10(b)(5) forbids a company or an individual to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. Maker Issues & Rights, Ltd. v. Tellabs, Inc. et. al. ("Tellabs II"), No. 04-1687, 2008 U.S. App. LEXIS 975, at *3 (7th Cir. Jan. 17, 2008) (citing 17 C.F.R. § 240.10b-5(b)). Liability under Rule 10(b)(5) requires proof of the defendant's "scienter," which is to say proof that the defendant either knew the statement was false or was reckless in disregarding a substantial risk that it was false. Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 756 (7th Cir. 2007).

To determine the sufficiency of the pleadings of scienter, the Supreme Court in Tellabs explained that, in considering a motion to dismiss, the district court must find an inference of scienter that is "cogent and compelling, and thus strong" in light of other competing inferences, and that a person would "deem the inference of scienter at least as strong as any opposing inference" drawn from the pleadings. Tellabs, 127 S.Ct. at 2510. In essence, Tellabs now requires the courts to weigh a plaintiff's inferences of scienter against competing inferences of non-culpable behavior. See ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 52 (1st Cir. 2008). For the Complaint to survive, the Plaintiff need only "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." Tellabs, 127 S.Ct. at 2513. We recognize that the Tellabs decision did, in fact, alter the pleading requirements for

8

scienter in the Seventh Circuit, but we must reject Defendants' contention that Tellabs "emphatically" or "dramatically" heightened the existing standards to which securities fraud claims are held. With these standards in mind, we now turn to the sufficiency of Plaintiffs' Complaint to satisfy the scienter requirement of its securities fraud claims.

## B. SUFFICIENCY OF THE PLEADINGS WITH REGARD TO SCIENTER

### 1. *Defendants' Involvement in the Alleged Scheme*

Plaintiffs have alleged throughout the Complaint that the individual Defendants were directly involved in and had knowledge of the contingent commission, steering and clawback arrangements. In support, Plaintiffs submitted a series of e-mails, memoranda and other documents that illustrate Defendants' direct involvement in the alleged schemes. Through their assertions and supporting documents, Plaintiffs demonstrated that the Defendants were not passive bystanders, but instead had an intimate knowledge of Aon's business operations, performance, financial results and contingent arrangements. We find, then, that the Complaint supports an inference of Defendants' knowledge, awareness and involvement in the alleged schemes. But this alone is not enough. While relevant to our inquiry, we recognize that allegations of Defendants' knowledge and involvement in the alleged schemes, by themselves, are not enough to adequately allege scienter. See Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989). In securities fraud cases, a plaintiff must take it a step further. A plaintiff must demonstrate that the defendant either knew, or would realize under the circumstances, that a failure to reveal the potentially material fact would likely mislead investors. Maker Issues & Rights, 437 F.3d at 600. Thus, the Court must continue its inquiry.

### 2. Motive to Conceal the Contingent Commission, Steering and Clawback Practices

Plaintiffs have pled enough to draw a cogent inference that the Defendants had a strong motive to actively conceal the company's contingent commission, steering and clawback practices from analysts and investors. We recognize that the absence of motive allegations is not dispositive, but that a failure to allege a plausible motive on the part of the individual defendants is relevant in undertaking an overall assessment of scienter. Tellabs, 127 S.Ct. at 2511.

First, putting aside the Defendants' personal bonuses, the Defendants had a strong incentive to maintain higher credit and debt ratings for the company. If Aon maintained a high credit and debt rating, the Defendants "were eligible to gain access to commercial paper, have financial flexibility and avoid paying higher borrowing costs on the Company's debt." Compl. at ¶ 181. To do so, Aon needed to sustain a financially sound reputation, putting forth a business model that risky contingent commission strategies did not support. Id. at ¶ 182. This is evidenced by the fact that many credit ratings providers either downgraded Aon's long-term debt ratings, or placed Aon on negative outlook and credit watches after the Defendants revealed their persistent use of contingent commission, steering and clawback practices. Id. at ¶ 184. As alleged, it was imperative for the Defendants to report consistent and substantial revenues, while hiding the questionable source of those revenues.

The Defendants challenge Plaintiffs' financial motives as insufficient to create a strong inference of scienter. We agree with the Defendants on this point. See, e.g., In Re JPMorgan Chase & Co. Securities Litigation, MDL No. 1783, 2007 WL 4531794, at *9 (N.D. Ill. Dec. 18, 2007) ("Pleading motive for compensation and reputation alone may not be sufficient to satisfy the PSLRA heightened pleading requirements on scienter"). Nevertheless, while financial

10

motives, by themselves, may be insufficient to show a strong inference of scienter, there is another motive alleged by Plaintiffs that this Court should address.

Beyond their economic motives, Plaintiffs alleged that the Defendants were also motivated by the contingent commission arrangements' potential negative impact on Aon's client relationships. As alleged, the Defendants' alleged scheme was not a small-scale practice for Aon, but an arrangement with insurance companies that became the driving force behind Aon's business model. Indeed, these arrangements allegedly constituted such a material source of income for Aon that their maintenance was crucial for the company's continued revenue growth. And, for the Defendants to maintain these arrangements, steering business to those insurance companies with whom Aon had contingent commission arrangements was an important part of the deal. But, more importantly, the maintenance of these arrangements came at a substantial cost to Aon's clients, who sometimes paid higher premiums to or received inferior coverage from Aon's "preferred" insurance companies that participated in the contingent commission arrangements. Aon's clients allegedly suffered as a consequence of the company's practices. Thus, in light of the potential negative impact on the company's client relationships, Defendants had a strong incentive to keep quiet from analysts and investors the true nature and magnitude of and the risks involved with Aon's contingent commission, steering and clawback arrangements. As to the inquiry before the Court, we find the Defendants' motivation relevant in our overall assessment of Plaintiffs' allegations regarding a strong inference of scienter on behalf of the Defendants.

### 3. Defendants Fail to Comply with GAAP and Substantially Inflate Reported Earnings

A strong inference of scienter lies within Plaintiffs' allegations regarding the Defendants' failure to comply with the Generally Accepted Accounting Principles ("GAAP") and the rules

11

promulgated by the United States Securities and Exchange Commission ("SEC"). Although allegations of GAAP violations, standing alone, are insufficient to raise a strong inference of scienter, GAAP violations may support the inference when coupled with additional circumstances, such as the magnitude of the accounting error, a defendant's prior notice of the error, or a defendant's responsibility for calculating and disseminating financial information. Takara Trust v. Molex, Inc., 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006) (citing Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003)). A court may additionally consider the "identification of the specific transactions alleged to have violated GAAP and the amount of detail provided in explaining those transactions." Takara Trust, 429 F. Supp. 2d at 980-81 (citing Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1104 (10th Cir. 2003)). Courts have held that significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter. Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1255 (N.D. Ill. 1997) (finding scienter properly alleged where accounting violations led to a drastic overstatement of company's yearly earnings and defendants were responsible for releasing financial information).

Plaintiffs alleged that Defendants failed to comply with GAAP and the SEC rules by, among other things, failing to disclose in Aon's accounting statements the contingent commissions, which constituted a material source of Aon's income. In 2003, as Plaintiffs allege, Aon recorded $169 million from its contingent commission arrangements, which accounted for a 20% overstatement of Aon's actual net income. Id. at ¶ 204. In the first two quarters of 2004 Aon recorded $76 million from its contingent commission arrangements, which accounted for a 17% overstatement of Aon's actual net income. Id. All in all, more than 20% of Aon's reported net income was attributable to the company's contingent commission practices during the Class Period. Id. From Plaintiffs' allegations, it is clear that the contingent commission revenues

12

constituted a material percentage of Aon's net income and profits, which, as a result, makes those revenues material to understanding Aon's financial position and operating results. Id. at ¶¶ 205-07. In this way, Aon allegedly violated GAAP and SEC rules when it failed to disclose that a substantial source of Aon's income stemmed from the company's contingent commission practices. Id. at ¶¶ 204-215. This is revealing given the amount of revenue that Aon's contingent commission practices generated.

Plaintiffs further alleged that the individual Defendants, as corporate executives, had the opportunity to make or correct the alleged omissions. In particular, Plaintiffs alleged that the individual Defendants each monitored and directed Aon's business, financial reporting and public statements. Specifically Plaintiffs alleged Defendants Ryan, O'Halleran and Bolger issued press releases regarding Aon's financial results and each participated in quarterly conference calls with analysts and investors to discuss Aon's business operations, prospects and quarterly results. Moreover, Plaintiffs alleged that individual Defendants Ryan and Bolger signed and certified Aon's SEC filings during the Class Period. In essence, Plaintiffs' allegations are sufficient to support their theory that Defendants were responsible for releasing Aon's financial information.

We find in this case that a strong, cogent inference exists that the Defendants either knew about the discrepancies in their accounting and financial statements or, in the very least, were reckless in accounting for and identifying the company's actual income and earnings, which may have misled investors. This inference arose from: (1) the magnitude of Aon's reporting errors; (2) the Defendants' alleged, conscious decision to conceal the contingent commission revenues; (3) the detail of Plaintiffs' allegations surrounding the alleged GAAP and SEC rule violations; and (4) the Defendants' responsibility for releasing Aon's financial information. Accordingly,

13

these allegations taken together support a strong inference of scienter on the Defendants' part and in support of Plaintiffs' securities fraud claims. See Takara Trust, 429 F. Supp. 2d at 980-81 (finding scienter adequately pled through detailed allegations of the individual defendants' authority over the company's finances, coupled with alleged, small GAAP violations).

### 4. Settlement of the NYAG Complaint

Plaintiffs contend that scienter is further established by the NYAG's complaint filed against Aon regarding its contingent commission practices, and Aon's quick settlement of the lawsuit. This argument, however, is shaky at best. The Seventh Circuit has yet to espouse as one of the factors to show scienter the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that lawsuit. On the other hand, Plaintiffs rely on and our research has turned up cases from district and appellate courts in the First and Sixth Circuits that specifically recognize ancillary lawsuits and their settlements as a factor to show scienter. See, e.g., Brown v. Earthbound Sports USA, Inc., 481 F.3d 901, 917 (6th Cir. 2007) (listing the factors the court considered in the past); Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999). Outside of these circuits, however, the only other court to consider ancillary lawsuits and their settlements as a factor is the Southern District of Texas. E.g., Collmer v. U.S. Liquids, Inc., 268 F. Supp. 2d 718, 751 (S.D. Tex. 2003) (citing Greebel). While this Court does not wholly reject the consideration of this factor to show scienter, it does agree with the Defendants that it does not necessarily contribute to a strong inference of scienter in this instance.

We can infer that Defendants' settlement of such a large action is likely a product of prolonged negotiations. Indeed, it is hard to imagine a situation in which, faced with a complaint of this magnitude filed by the NYAG and three other state agencies, the corporation's attorneys

14

and executives mull it over for a day and then decide to settle the action immediately because the charges are particularly contemptuous. There is nothing to support the allegation that the settlement in this case was "swift." We side with the Defendants on this issue, noting that the proximity of the complaint and the settlement contributes, if at all, to a weak and tenuous inference of scienter on behalf of the Defendants, one that is certainly not enough to establish securities fraud after Tellabs.

The post-Class Period statements, on the other hand, provide stronger support for the Plaintiffs. We realize, as Defendants point out, that hindsight pleadings hold little weight, but the statement offered by Defendant Ryan mentions specifically that the Defendants violated Aon's Values Statement and its Code of Ethics when Aon entered into the contingent commission and other agreements. These statements, when viewed in light of other considerations, lend support to a strong inference of scienter. See Schleicher v. Wendt, No. 02-cv-1332, 2007 WL 2705584, at *12 (S.D. Ind. Sept. 12, 2007) (noting that a violation of a company's own accounting or other policies can provide direct or circumstantial evidence of scienter, when considered with other factors); see also In Re Baan Co. Securities Litigation, 103 F. Supp. 2d 1, 21-22 (D.D.C. 2000) (violating stated policy is evidence of conscious choice); Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 235 (D. Mass. 1999) ("Courts have held that violation of a company's own policy supports an inference of scienter"). These statements are especially noteworthy, seeing that they contradict the company's earlier statements made after the NYAG filed its complaint against Marsh & McLennan Companies. While this alone is insufficient to establish scienter, the Court shall consider Defendant Ryan's statements for this analysis.

## C. OPPOSING INFERENCES DO NOT OUTWEIGH INFERENCES OF SCIENTER

Again, for the Complaint to survive, the Plaintiff need only "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." Tellabs, 127 S.Ct. at 2513. Thus, at this point we should consider any opposing inferences put forth by the Defendants. First, the Defendants contend that any inference of scienter is undercut by the Defendants' subjective beliefs that they engaged in a lawful practice of accepting contingent commission revenues, and they did not realize that investors would be misled absent the amount of the contingent revenues listed in the company's financial statements. In a similar argument, the Defendants maintain that contingent commission arrangements were a long-standing industry practice, and thus the Defendants had no idea that such arrangements would be unsustainable. But these arguments, while certainly relevant, do not subvert Plaintiffs' allegations of scienter and further overlook the possibility of Defendants' recklessness.

What nullifies these arguments at this point is that they take the form of affirmative defenses. While these arguments may come into play in a motion for summary judgment, it is premature at this point for the Court to consider any additional facts put forth by the Defendants that merely contradict the allegations in the Complaint. The Complaint here includes enough particular facts to create a strong inference that the Defendants actually knew or must have known that shareholders would be misled without the additional information regarding Aon's contingent commission practices. In fact, taking the Complaint as a whole, we cannot say that Defendants did not realize, or that a reasonable person would not have realized, that a failure to reveal the alleged material facts would likely mislead investors. On the other hand, we can infer from the Complaint that the Defendants knew of the contingent commission practices, had a motivation to hide the magnitude, risks and nature of the contingent commission practices,

committed substantial errors in complying with GAAP and SEC rules and later even admitted that they failed to comply with the company's internal policies when they took part in the contingent commission, steering and clawback arrangements. What is more, given the alleged magnitude of the practice and associated accounting errors, we can at least infer that the Defendants acted recklessly in failing to inform investors of the risks involved with and scale of the practice. These allegations raise a strong inference of scienter that outweighs any inference, drawn from the Complaint, that Defendants did not realize their alleged misstatements and omissions would mislead investors. Again, we are required to take the allegations as true at this stage of the pleadings.

Defendants also contend that Plaintiffs failed to plead facts demonstrating that Aon's contingent commission revenues significantly increased during the Class Period as compared to prior periods. Under this theory, Defendants maintain that Plaintiffs, by failing to plead a significant increase in contingent commission revenues, cannot overcome the inference that Aon's financial performance during the Class Period stemmed from increased client sales or by other, legitimate means. As such, we can infer that the Defendants' statements to analysts and investors were in fact true, which negates an inference of scienter.

We agree with the Defendants that such an inference exists. It is plausible that if other means of revenues existed, and that contingent commission revenues did not dominate Aon's income during the Class Period, then the Defendants may not have believed that their statements were false and misleading. But this does not account for the alleged omissions. Covering up Aon's poor financial condition is only one part of the picture. Increased product sales do not entirely break the inference that Defendants failed to account for the true nature and magnitude of Aon's contingent commission practices, because they knew that such a disclosure would

negatively impact the company and its clients. We see, then, that the inference of scienter for securities fraud is therefore just as likely, and, in fact, stronger than the opposing inference regarding Defendants' statements about Aon's sources of increased revenue. This is all Plaintiff needs to survive a 12(b)(6) motion. See Tellabs, 127 S.Ct. at 2513.

## III. CONCLUSION

For the reasons stated above, Defendants' Motion to Reconsider Denial of Their Motion To Dismiss the Consolidated Amended Complaint In Light of New Controlling Authority is denied.

IT IS SO ORDERED.

ENTER:

_____
CHARLES R. NORGLE, Judge
United States District Court

DATED: 3/7/08